## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| BUTLER NATIONAL CORP., | : | |
| Plan Administrator of the Butler National Corp. | : | Case No. 1:12-cv-177 |
| 401(k) Profit Sharing Plan | : | |
| 19920 West 161st Street | : | |
| Olathe, Kansas 66062 | : | |
| | : | |
|     and | : | |
| | : | |
| C3 CAPITAL, LLC, | : | |
| Plan Administrator of the C3 Capital, LLC | : | CLASS ACTION COMPLAINT |
|     Safe Harbor 401(k) Plan and Trust | : | WITH JURY DEMAND |
| 4520 Main Street, Suite 1600 | : | |
| Kansas City, Missouri 64111 | : | |
| | : | |
| On Behalf of Themselves and All Others | : | |
| Similarly Situated, | : | |
| | : | |
|               Plaintiffs, | : | |
| | : | |
|       vs. | : | |
| | : | |
| THE UNION CENTRAL LIFE | : | |
| INSURANCE CO., | : | |
| 1876 Waycross Road | : | |
| Cincinnati, Ohio 45240 | : | |
| | : | |
|      Defendant. | : | |

Plaintiffs, Butler National Corp. ("Butler") and C3 Capital, LLC ("C3 Capital")

(collectively, "Plaintiffs"), by and through their undersigned counsel, in support of this Complaint,

hereby plead and aver as follows:

### I.  INTRODUCTION

1.  Union Central (defined below) has entered into revenue sharing agreements and similar

arrangements ("revenue sharing contracts" or "participation agreements") with various mutual

funds, affiliates of mutual funds, mutual fund advisors, investment advisors and sub-advisors,

investment funds, including collective trusts, and other investment advisors, instruments or

vehicles (collectively, "mutual funds") pursuant to which Union Central receives revenue sharing payments (which amount to kickbacks) for its own benefit from these mutual funds in violation of, *inter alia*, the prohibited transaction rules of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001 *et seq.* (*i.e.*, ERISA §§ 404 and 406(b), 29 U.S.C. §§ 1104 and 1106(b)), as well as ERISA's fiduciary rules (*i.e.*, ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)).

2.     The kickback payments at issue are essentially part of a pay-to-play scheme in which Union Central receives payments from mutual funds in the form of 12b-1 fees, administration fees, service fees, sub-transfer agent fees and/or similar fees (the "revenue sharing payments") in return for providing the mutual funds with access to its retirement plan customers, including its 401(k) plan customers.

3.     Union Central uses its ownership and control over separate accounts in which its retirement plan customers' investments are placed to negotiate for the receipt of these revenue sharing payments from mutual funds, and the revenue sharing payments have the effect of increasing the expense ratios of the mutual funds, which expenses are deducted directly from the assets of the separate accounts.

4.     The revenue sharing payments are based, in whole or in part, on a percentage of the retirement plans' investments in a mutual fund that are delivered to it by Union Central and/or based on the magnitude of the investments by such retirement plans in the mutual fund.

5.     While the revenue sharing payments are often internally described by service providers, such as Union Central, as "services fees" and reimbursement for expenses incurred in providing services for, to or on behalf of the mutual funds, the amount of the revenue sharing

payments bears absolutely no relationship to the cost or value of any such services.

6.      The services provided by Union Central that may incidentally benefit mutual funds (beyond pure and simple access to retirement plan customers -- referred to sometimes as pay-to-play, shelf-space or kickback arrangements) are actually services that Union Central has historically provided to its retirement plan customers as a necessary part of its business in return for fees directly collected by it from such customers. These fees generally did not change as a result of Union Central's receipt of the revenue sharing kickbacks from the mutual funds and were not reduced in a manner that corresponds with the amount of revenue sharing kickbacks received.

7.      Union Central's receipt of the revenue sharing payments at issue violates ERISA's prohibited transaction and fiduciary duty rules because the receipt of such payments places Union Central in a conflicted position in which the interests of its retirement plan customers can be and are sacrificed in the interest of Union Central earning greater profits through the receipt of revenue sharing payments.

8.      As explained below, Union Central also has engaged in acts of self-dealing with respect to the retirement assets of the Plans and the Class held in the Separate Accounts (defined below) and, in so doing, also has otherwise violated the prohibited transaction rules of ERISA, as well as ERISA's fiduciary rules.

9.      This is an action for equitable relief and damages under ERISA in which Plaintiffs seek to recover for the benefit of their 401(k) plans and all other similarly situated retirement plans and entities (collectively, the "Plans"), also known as employee pension benefit plans under ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A), that are subject to Internal Revenue Code Sections 401(a) and 401(k), the revenue sharing payments and other compensation that Union

Central improperly received.

10.     Plaintiffs bring this action on their own behalf and on behalf of all those similarly situated Plans under ERISA §§ 409(a) and 502(a)(2) and (g), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (g), to recover the following relief:

- A declaratory judgment holding that the acts of Defendant described herein violate ERISA and applicable law;

- A permanent injunction against Defendant prohibiting the practices described herein;

- Disgorgement and/or restitution of all the revenue sharing payments and other compensation improperly received by Union Central, or, alternatively, the profits earned by Union Central in connection with its receipt of such revenue sharing payments and other unlawful compensation;

- Compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.     THE PARTIES

11.     Butler is the Plan Administrator of the Butler National Corp. 401(k) Profit Sharing Plan ("Butler Plan").   In that capacity, Butler is a fiduciary of the Butler Plan.   Both Butler and the Butler Plan are located at 19920 West 161st Street, Olathe, Kansas 66062.   Butler's principal executive office and its principal place of business are located in Olathe, Kansas.

12.     C3 Capital is the Plan Administrator of the C3 Capital, LLC Safe Harbor 401(k) Plan and Trust ("C3 Capital Plan").   In that capacity, C3 Capital is a fiduciary of the C3 Capital Plan.   Both C3 Capital and the C3 Capital Plan are located at 4520 Main Street, Suite 1600, Kansas City, Missouri 64111.   C3 Capital's principal place of business is in Kansas City,

Missouri.

13.     Defendant, The Union Central Life Insurance Company ("Union Central" or "Defendant"), is a business entity with its headquarters and principal place of business located at 1876 Waycross Road, Cincinnati, Ohio 45240.   Union Central is a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### III.     JURISDICTION AND VENUE

14.     Plaintiffs seek relief on behalf of the Butler Plan, the C3 Capital Plan and all other similarly situated Plans pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Section 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e)(1)-(2), 29 U.S.C. § 1132(e)(1)-(2).

16.     Venue is proper in this judicial district pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391, because Union Central maintains its headquarters and principal place of business in Cincinnati, Ohio.

17.     At all pertinent times, Union Central has conducted its retirement business and the retirement business of all other Union Central affiliates from its offices in this judicial district in Cincinnati, Ohio, which functions as the nerve center for the retirement operations of Union Central, which is known and sometimes referred to as Union Central Retirement Plans.

### IV.     BACKGROUND FACTS

**A.     <u>The Services That Union Central Provides To The Plans</u>**

18.  At all pertinent times, Union Central has held itself out and continues to hold itself out to

-5-

Plaintiffs and the Class as providing a full array of services, that Union Central can help design and maintain a long-term retirement strategy for a company and its employees and that Union Central can provide these services to all sizes and segments of the defined contribution market.

19.    Union Central represents itself as an industry leader with experienced teams in the retirement industry.   Union Central also represents that it utilizes an innovative approach toward providing such services.

20.    Union Central's retirement services are provided from a corporate perspective by Union Central Retirement Plans, a division of Union Central.

21.    The Plans' assets are included in the $33.2 billion in total assets managed by Union Central and its affiliates and the over $5.6 billion managed by Union Central and its affiliates held in Separate Accounts (defined below).

22.    Union Central is considered a leader in providing services to the "micro" (less than $5 million in assets) and "small" (between $5 million and $50 million in assets) employer retirement markets, which markets include retirement plans such as the Butler Plan and the C3 Capital Plan.   Union Central markets itself as providing employers, such as Butler and C3 Capital, with the full range of services sufficient to offer retirement benefits to its employees.

23.    One of Union Central's most profitable lines of business is providing services associated with retirement and benefit plans.   Union Central, along with its affiliates, provides services to more than 3,600 retirement plans.

24.    The retirement plan services Union Central provides include record-keeping, compliance, allocation of participant contributions, distribution of account proceeds to departing participants, loan processing and administrations, asset transfer, IRS tax withholding and

reporting, provision of benefits illustrations, processing and distribution of benefits and withdrawals, and administration of communications with participants.

25.     Union Central provides a number of services to the Plans generally and the Butler Plan and the C3 Capital Plan specifically, including supplying Plaintiffs with all contract documents; providing Plaintiffs with quarterly activity statements; responding to customer inquiries on behalf of the Plans; updating contractual, regulatory and disclosure documents; performing a daily valuation of the Plans' assets, while also managing the assets of the Plans that are held in the Separate Accounts (defined and described more fully below); and conducting all settlement operations regarding the assets of the Plans from its offices and by and through its employees, including its officers and executive team, that are all located in Cincinnati, Ohio.

**B.      The Agreements Between The Plans And Union Central**
         <u>**And The Retirement Investments Provided Under Those Agreements**</u>

26.     Pursuant to the terms of the Allocated Group Annuity Policy Contracts or Group Funding Agreements (the "Contracts" or "Group Contracts"), Union Central represents that it manages Plaintiffs' and other Class members' retirement plan assets.   Union Central enters into these standard form Group Contracts with virtually all of the Plans.

27.     Pursuant to the Group Contracts or similar group funding agreements, Union Central provides investment options to the Butler Plan, the C3 Capital Plan, and other similarly situated Plans, through insurance products called group variable annuities or through similar insurance arrangements/vehicles.

28.     Pursuant to the terms of the Group Contracts, the Plans' retirement assets are invested into, *inter alia*, Separate Accounts created by Union Central for the purpose of investing in mutual funds, which (i) Union Central owns along with all of the retirement assets contained in

those accounts (and for which Union Central indisputably functions as a fiduciary under applicable law), (ii) are created under and pursuant to Ohio law or other state laws, (iii) are not charged with the liabilities of Union Central to the extent of the reserves and anticipated contract liabilities of those accounts, but otherwise are subject to the claims of creditors of Union Central, (iv) buy and hold the shares of the mutual funds in which the Plans' participants choose to invest, and (v) are utilized by Union Central as the tool to negotiate revenue sharing or participation agreements with the mutual funds so that Union Central can earn additional compensation that bears no relationship to the services that it provides to the Plans and/or the mutual funds.

29.     Plans and their participants do not invest directly in the mutual funds, but invest in "variable accounts," including the "Separate Accounts," all of which are established by Union Central.

30.     The Separate Accounts are established, administered, owned and managed by Union Central and the Separate Accounts' assets are segregated from the general assets of Union Central.

31.     The Separate Accounts are part of an investment vehicle known as a group variable annuity offered by Union Central.   A group variable annuity is an insurance contract that provides for, *inter alia*, "Separate Account" investments.   These investment vehicles are used to fund qualified retirement plans, like 401(k), profit-sharing, and other types of company-sponsored retirement plans.   The Separate Accounts permit Union Central to pool the investments of the Plans to invest in mutual funds and similar investments.   The assets of each Separate Account are segregated (or separate) from all of the other assets of Union Central but, as explained above, are not entirely immune from the claims of creditors of Union Central.   The Separate Accounts

purchase and own selected mutual funds or other funds/investment vehicles that mimic the performance of these mutual funds.

32.     The Separate Accounts maintained by Union Central are divided into sub-accounts that correspond to the mutual funds and other investment options available under the Group Contracts that Union Central maintains with the Plans.

33.     The Separate Accounts are divided into accumulation units (sometimes referred to as "record units") that track the performance of shares of a selected mutual fund investment with the price per accumulation unit calculated by dividing the total value of the assets of the Separate Account by the number of units in the Separate Account.

34.     Pursuant to the Group Contracts, participants may choose the mutual funds in which their contributions and any matching contributions made by their employers are invested, and Union Central allocates those contributions to particular sub-accounts within the Separate Accounts that correspond to the chosen mutual funds.    In return for the contributions, which are assets of these ERISA qualified plans, the Plans and their participants receive accumulation units (shares) in the applicable sub-accounts of the separate accounts, which accumulation units, like the Separate Accounts themselves and the sub-accounts, are held and owned by Union Central.

35.     Union Central maintains authority and control over the Separate Accounts, the sub-accounts and the accumulation units.

36.     The accumulation units of the Plans and their participants, which are held by Union Central, like the Separate Accounts and sub-accounts, constitute assets of the Plans.

37.     Based on the combined contributions to the sub-accounts made by all of these Plans and their participants, Union Central sells and purchases mutual fund shares to hold in the Separate

Accounts (and receives revenue sharing kickbacks in return for these purchases).

38.  The value of a plan's accumulation units (shares) in the Separate Account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.

39.  Pursuant to the Group Contracts administered and managed by Union Central and issued in the name of Union Central, Union Central manages the retirement assets of the Plans in the Separate Accounts and serves as legal title owner and holder of the assets in the Separate Accounts.   The investments of the Butler Plan and the C3 Capital Plan are held in Separate Accounts in the name of Union Central, which are administered and managed by Union Central as well.

40.  Union Central exercises discretionary authority and control with respect to the Plans' assets held in the Separate Accounts by, among other things, electing to receive dividends from the mutual funds into the Separate Accounts in the form of additional mutual funds shares and/or by making the affirmative investment decision to reinvest all cash dividends from mutual funds in additional mutual fund shares of the same mutual funds.

41.   Under the terms of its own Group Contracts, and in recognition of its fiduciary status, Union Central holds the Plans' assets in Separate Accounts under its own name, places those funds in short-term investments as it sees fit (*i.e.*, in its discretion), and may set off certain amounts the funds hold in those Separate Accounts, based on its own unilateral determinations with respect to the non-payment of fees and other factors, before ultimately transferring the Plans' assets to mutual funds in return for which it is paid kickbacks.

42.  Union Central also influences its own compensation by effectively electing to receive all dividends payable to the Plans from mutual funds in the form of additional mutual fund

shares, thereby increasing the amount of the assets of the Plans in the Separate Accounts and under Union Central's management, thereby increasing the amount of revenue sharing kickbacks payable to Union Central.

43.    Union Central also places the Plans' investments in a "suspense account" or the equivalent thereof when awaiting further or clarifying investment instructions from the Plans' participants.   Union Central acts as a fiduciary with respect such temporary accounts and, even during this holding period, Union Central earns, without justification, impermissible revenue sharing payment kickbacks and other fees from its suspense account investments.

44.    Union Central indisputably holds, owns, administers, manages and controls the Separate Accounts, as well as their sub-accounts, and uses the Separate Accounts as a delivery mechanism to purchase and sell shares in the mutual funds.

45.    In direct return for delivering these funds from the Separate Accounts to the mutual funds, Union Central receives the revenue sharing kickbacks at issue pursuant to the scheme detailed below.

46.    Union Central owns and manages the Separate Accounts and maintains and exercises discretion and control with respect to the retirement assets in the Separate Accounts. Union Central is able to influence and control its own compensation derived from the Separate Accounts by, among other things, negotiating the terms of the participation agreements with the mutual funds, which generally make revenue sharing payments on the basis of the assets invested by the Separate Accounts in their mutual funds.   As detailed in the Group Contracts, Union Central maintains complete discretion to substitute, eliminate and add funds within its Separate Accounts.   Union Central also reserves the right to transfer assets of the Plans between Separate

Accounts and to make changes within the Separate Accounts, including creating new divisions of the Separate Accounts, creating new Separate Accounts and new segments or divisions of those accounts, combining any two or more Separate Accounts segments or divisions, making available additional or alternative divisions of the Separate Accounts investing in additional investment companies, investing the assets of the Separate Accounts in securities other than shares of the funds, operating the Separate Accounts as a management investment company under the 1940 Act or withdrawing such registration if no longer required, substituting one or more funds for other funds with similar investment objectives, deleting funds or closing funds to future investments, and changing the name of the Separate Accounts.

47. Union Central also controls the menu of available mutual funds offered in its Separate Accounts and retains the discretion to change its fund menus and to not offer certain investment options to Plans based upon contract pricing and other considerations.

48. Under the Group Contracts, Union Central also retains and exercises the discretion and control to self-determine its own compensation under the Separate Accounts by (a) calculating the current value of the Separate Accounts by applying a "daily asset charge," which Union Central calculates itself based on so-called "expense risks" and which can, in Union Central's discretion, include a profit payable to Union Central, and (b) applying so-called "experience credits" to reduce or increase the fees charged to the Separate Accounts, based upon Union Central's unilateral determination. Union Central uses its ownership of and control over the Separate Accounts and their assets, as well as this discretion and control which it exercises, to, among other things, negotiate for the receipt of revenue sharing payments from mutual funds.

49. Upon information and belief, Union Central also utilizes the assets contained in the

Separate Accounts, all of which appear on its balance sheet, to earn additional compensation independent of the revenue sharing payments by utilizing uncommitted assets in these Separate Accounts to engage in certain hedging transactions, securities lending transactions, and to negotiate for the payment of additional compensation from third parties on the basis of its ownership and control of these retirement assets.   Thus, Union Central utilizes its ownership and authority over the Separate Accounts, as well as the discretion and control that it exercises over the Separate Accounts, to earn additional, undisclosed compensation from third parties by essentially investing the retirement assets of its customers through schemes and utilizing devices independent and separate apart from the investment of these assets in mutual funds and other contemplated investments.

50.     Pursuant to the Group Contracts, Union Central charges the Butler Plan, the C3 Capital Plan, and other similarly situated Plans separate account fees (typically referred to as "mortality and expense risk charges" or "wrap fees"), which are calculated by taking a percentage of the daily value of a given plan's investment in the Separate Accounts in and through which Union Central purchased, sold, and held the shares of the underlying mutual funds.

51.     The Group Contracts also obligate the Butler Plan, the C3 Capital Plan, and other similarly situated Plans to pay Union Central brokerage commissions, transfer taxes, and any expenses incurred by Union Central, which Union Central determines are reasonably necessary to preserve or enhance the value of the assets in the sub-accounts (which are expressed in terms of accumulation units discussed below) representing these Plans' ERISA qualified retirement investments.

52.     The Group Contracts do not disclose that revenue sharing payments will be made to

Union Central by the mutual funds offered as investments to the Plans or that Union Central will utilize the Separate Accounts investments to generate profits based upon the existence and leveraging of these assets for Union Central's own benefit.

## C.     The Plans

53.     At all pertinent times, the Butler Plan was a 401(k) retirement plan and, as of the date of the filing of this Complaint, it remains a 401(k) retirement plan.   Butler and the Butler Plan's participants have funded and continue to fund the Butler Plan.

54.     At all pertinent times, the C3 Capital Plan was a 401(k) retirement plan and, as of the date of the filing of this Complaint, it remains a 401(k) retirement plan.   C3 Capital and the C3 Capital Plan's participants have funded and continue to fund the C3 Capital Plan.

55.     Under the Plans' basic contract documents, and through the Group Contracts with Union Central, participants are entitled to invest in various mutual funds selected by Union Central for inclusion as investment options within the Plans.

56.     Plaintiffs are informed and believe that thousands of qualified ERISA retirement Plans are members of the Class, as defined below, which contracted with Union Central to provide the same or similar services with respect to the management and administration of the Plans and the disposition, investment and management of these Plans' assets.

## D.     The Relationship Between And Among Class
## Members, Union Central And The Mutual Funds

57.     The employers that are the sponsors and plan administrators of the Plans, which compose the Class, engage full-service providers, such as Union Central, to design and implement the qualified ERISA retirement plans and to provide an entire range of administrative, investment, management, and other services necessary to operate them.   Agents of Union Central solicit

-14-

business, on its behalf, on the basis that it is a full-service provider that designs and implements such qualified ERISA retirement plans, and these agents for Union Central receive commissions for obtaining such business for Union Central.

58.     In promoting its services, Union Central claims to be a leading provider for corporate retirement plans that offers a comprehensive array of retirement solutions for its customers.

59.     After setting up a qualified ERISA retirement plan such as Plaintiffs' Plans, Union Central provides all of the services necessary for such plans to operate, including record-keeping, compliance, allocation of participant contributions, distribution of account proceeds to departing participants, loan processing and administration, asset transfers, IRS tax withholding and reporting, provision of benefits illustrations, processing and distribution of benefits and withdrawals, and administration of communications with participants.

60.     Union Central knew or reasonably should have known of the material importance of fees and costs to the Plans and their participants, including the amount of any "revenue sharing payments."

61.     Mutual funds contract with various entities to perform managerial, administrative, accounting, legal and other services.   Mutual funds pay the entities providing those services, and the mutual funds pass those costs on to their investors by charging them a variety of fees, which are typically referred to as investment management fees, distribution fees, commissions, sub-transfer agency fees, marketing fees, or 12b-1 fees.   Investors thereby effectively pay fees to the mutual funds for these and other services.   The mutual funds determine these fees based on a designated percentage of the net asset value of all of the shares held in the mutual fund, causing the net asset

value of all of the shares to decrease by the proportionate percentage attributable to these shares. As a result of the charging of these fees, by way of example, the value of the mutual fund shares held by Union Central in the Separate Accounts decreases by a corresponding percentage, which, in turn, reduces the value of each of the Plans' and each of the participants in the Plans' accumulation of units held by Union Central in the Separate Accounts.

62.     At all relevant times, the mutual funds offered by Union Central to the Plans have been offered through Group Contracts and similar contracts.   Certain of these funds have been owned and/or operated by Union Central itself or its subsidiaries or affiliates.

63.     In return for the fees and other amounts charged to the Plan and other similarly situated Plans, Union Central selects, maintains and monitors a menu of mutual funds available for investment by these Plans while, as explained above, reserving the right to unilaterally change the composition of that menu of mutual funds.

64.     Pursuant to its contracts with the Butler Plan, the C3 Capital Plan, and other similarly situated ERISA retirement Plans, Union Central has the discretion to unilaterally cease offering mutual funds selected by participants and substitute, in their place, other investments selected by Union Central.   Upon information and belief, Union Central has added, removed, or substituted offerings of mutual funds on its menu of available investments for current and future Plans.

65.     Under the Group Contracts, Union Central retains the unfettered and sole discretion both to delete any Separate Account and the corresponding mutual fund investment established and to offer new Separate Account investments.

66.     Union Central retains the discretion, authority, and control to delete and add

-16-

investment options from the Plans' available menu of investments.

67.     Union Central also retains the right and discretion to unilaterally change its investment management and administrative charges assessed under the Group Contracts.

68.     Union Central has engaged investment advisors and other professionals to review the investment options available to participants in the Plans, allegedly to ensure that the investment options comprise a wide array of asset classes and money managers that can be used to build a well diversified retirement program for 401(k) participants, as well as to manage certain proprietary funds offered by Union Central.   Union Central's primary criterion for inclusion of a mutual fund on its menu of funds, as well as the selection of advisors to manage proprietary mutual funds, however, is the amount of revenue sharing payments that the mutual fund is willing to pay Union Central, and this criterion trumps the appropriateness of the investment and/or the size of fees and costs that the Plans (and their participants) will be required to pay as a result of, *inter alia*, asset-based charges and the share classes of the designated mutual funds.   Indeed, in its marketing and other materials, Union Central attempts to conceal the nature of the higher cost share classes that it includes in its retirement offerings as providing certain advantages to Plans when, in fact, the only reason for the inclusion of these higher cost share classes of the mutual funds is that (a) the mutual funds can use these higher fee share classes to earn greater compensation, and (b) Union Central can share in this increased compensation in the form of revenue sharing payments/kickbacks.

69.     The mutual funds establish the percentages of the Plans' assets that they charge as fees for their services to cover their normal operating expenses, as well as anticipated profit, and the amount of the revenue sharing payments that they have agreed to make to Union Central.

70.     The revenue sharing payments do not bear any relationship to any services performed by Union Central.   In fact, Union Central cannot ascribe specific services performed to the revenue sharing payments received and, when Union Central obtains increased revenue sharing payments from mutual funds, it provides no additional services.   Instead, Union Central literally has lined its pockets with tens of millions of dollars in revenue sharing payments by and through self-dealing, other prohibited transactions and breaches of fiduciary duty.

71.     In certain materials available to customers, Union Central has recently, obliquely, and deceptively referenced its receipt of revenue sharing payments, including 12b-1 fees, service fees and sub transfer agency/expense reimbursement fees.   In referencing such revenue sharing payments, however, Union Central has attempted to mask the nature of these kickback payments by falsely and deceptively claiming that the payments relate to the provision of services by Union Central on behalf of the mutual funds, even though the payments at issue bear no relationship to any services that Union Central purportedly provides on behalf of the mutual funds.   In addition, although Union Central has claimed in certain communications that the revenue sharing payments are used to reduce the amount of payments made by the Plans, Union Central has not and does not provide any specific credit to the Plans to account for the revenue sharing payments that it receives (and Union Central has not calculated or directly attributed the reduction in any fees charged to the Plans to the actual amount of revenue sharing payments received by Union Central).

72.     In recognition of the fact that Union Central deliberately attempts to conceal the true nature and magnitude of the revenue sharing payments, Union Central generally ignores requests from its customers, including Plaintiffs, that it provide them with detailed information regarding its receipt of revenue sharing payments and otherwise falsely or deceptively

characterizes the "revenue sharing payments" as being used to offset expenses paid by the Plans when, in fact, no such offset occurs.

73.     At all pertinent times, Union Central's receipt of the revenue sharing payments and other improper compensation delineated in this Complaint constituted a continuing violation of ERISA and was fraudulently and deceptively concealed by Union Central.

74.     Even assuming *arguendo* that Union Central contends that it somehow adequately disclosed the existence and nature of these revenue sharing payments, regardless of how it obscured such disclosure (or purports to assert that any of the Plans consented to its conduct), Union Central's receipt of revenue sharing payments for its own account is *per se* unlawful and cannot be excused by alleging that there was any purported disclosure or consent.   Similarly, Union Central's receipt of compensation on its own account by leveraging the assets contained in the Separate Accounts, which amounts to self-dealing and the self-payment to Union Central of unreasonable compensation through the investment and use of the Plans' retirement assets, violates applicable law (specifically, ERISA).

75.     While effectively keeping the revenue sharing payments a secret from its customers and the Plans, Union Central regularly negotiates with mutual funds to increase the amount of these payments despite the undesirable impact of increased payments on Plaintiffs and the Plans.

**E.     The Revenue Sharing Scheme**

76.     Union Central holds itself out to Plaintiffs, the Class, and the public as an expert in administering employee pension benefit plans and with respect to developing investment strategies, goals and philosophies, and making investment recommendations.

77.     At all pertinent times, Union Central implemented and participated in a scheme

whereby mutual funds made revenue sharing payments to it based upon a percentage of the Plans'
assets invested in these mutual funds, respectively, by and through Union Central.   Union Central
explicitly made it a condition to offering a mutual fund family's funds to the Plans that the mutual
fund family pays it revenue sharing on all or most of the funds offered and/or recommended by
Union Central.

78.     To implement this scheme, Union Central negotiated revenue sharing agreements
with mutual funds on behalf of itself and its affiliates.

79.     Revenue sharing payments are made to Union Central pursuant to written contracts
("revenue sharing contracts" or "participation agreements"), often also referred to as service
contracts, administration contracts, fund services contracts, fund participation contracts, and
broker dealer contracts, and these contracts are often entered into by and between Union Central
and the mutual funds or the investment management firms that provide management and other
services to mutual funds.

80.     These revenue sharing payments may be in the form of 12b-1 fees (which are
supposed to be fees for marketing of the fund), administration fees, service fees, sub-transfer agent
fees, and/or similar fees.   All of the revenue sharing payments are based, in whole or in part, on a
percentage of a given plan's investment in a mutual fund and/or based on the magnitude of the
investments by the Plans in the mutual fund.

81.     While the revenue sharing payments are often described in participation
agreements as reimbursements for expenses incurred in providing services to the mutual funds,
those services by which mutual funds may incidentally benefit are actually ones that Union Central
has historically provided to the Plans as a necessary part of its business in return for the fees

directly collected by it, and these fees did not change as a result of revenue sharing or based upon the percentage or the magnitude of a plan's investments in the mutual fund.

82.     The revenue sharing payments are generally calculated based upon a percentage of the Plans' assets invested in the mutual funds by and through Union Central.   These amounts are not based on the cost of providing the services or a reasonable fair market value for Union Central's services.   Typically, the fees for Union Central's services would be provided on an annual per participant basis and not on a percentage of assets or revenue sharing basis. Furthermore, the reasonable fair market price of Union Central's services would be significantly less than the amounts of the revenue sharing payments received by it.   Finally, Union Central earns disproportionate profits on the basis of the revenue sharing payments it receives.

83.     At all pertinent times, Union Central has been arranging for, receiving, and keeping the revenue sharing payments for its own use and benefit, in breach of its fiduciary duties under ERISA.   These revenue sharing payments range from twenty-five (25) basis points of the total assets of the Plans to substantially greater revenue sharing payments.

84.     Under all of the circumstances, the revenue sharing payments received by Union Central constituted excessive fees and otherwise violated ERISA because the receipt of these revenue sharing payments constituted prohibited transactions under ERISA.

**F.     Union Central Also Improperly Earns Income On The
        Separate Accounts Through Its Conflicted Arrangements And Self-Dealing**

85.     Union Central also has utilized investments in the Separate Accounts through leveraging and securities lending schemes to earn additional, undisclosed compensation and these acts of self-dealing have resulted in Union Central earning additional, undisclosed, and excessive compensation as a result of its use of the Plans' retirement assets for its own profit and gain.

-21-

## V.       CLASS ACTION ALLEGATIONS

86.      This action is brought as a class action by Plaintiffs, on behalf of themselves and the following proposed class ("Class"):

> **Class**
>
> All administrators of employee pension benefit plans covered by the
> Employee Retirement Income Security Act of 1974 subject to
> Internal Revenue Code §§ 401(a), (k) with which Union Central has
> maintained a contractual relationship based on a group annuity
> contract or group funding agreement.

Excluded from the Class are Defendant, any administrators of employee pension benefit plans for which Defendant's directors, officers or employees are beneficiaries, and any employee pension benefit plans for which the Judge to whom this case is assigned or any other judicial officer having responsibility for this case is a beneficiary.

87.      This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

88.      **Numerosity**.   Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.   As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

89.      **Commonality**.   There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)      whether Defendant acted and continues to act as fiduciary under ERISA in connection with the conduct described herein;

(b)      whether Defendant breached its fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plans;

(c)      whether Defendant engaged in prohibited transactions by receiving the revenue sharing payments for its own benefit and otherwise earning excessive compensation and effectively charging excessive fees for the administrative, management and investment services it provided to the Plans;

(d)      whether Defendant failed to disclose or inform the Plans of the existence and true nature of the revenue sharing payments, as well as the excessive fees and compensation, received by Union Central; and

(e)      whether and what form of relief should be afforded to Plaintiffs and the Class.

90.      **Typicality**.    Plaintiffs, which are members of the Class, have claims that are typical of all of the members of the Class.   Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendant and arise under the same legal theories that are applicable as to all other members of the Class.

91.      **Adequacy of Representation**.   Plaintiffs will fairly and adequately represent the interests of the members of the Class.   Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.   Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

92.      **Predominance**.   Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.   Indeed, virtually the only

individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar certification.

93.     **Superiority**.   A class action is superior to all other feasible alternatives for the resolution of this matter.   The vast majority, if not all, of the Class members are unaware of Defendant's breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.   Furthermore, even if they were aware of the claims they have against Defendant, the claims of the virtually all Class members would be too small to economically justify individual litigation.   Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

94.     **Manageability**.   This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

95.     Defendant has acted on grounds generally applicable to the Class by uniformly subjecting them to the revenue sharing scheme described above, which scheme Defendant clearly intends to continue to perpetrate in the future.   Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

## COUNT I

### (For Breach Of Fiduciary Duty)

96.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

97.     Defendant is a fiduciary of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), as explained above, and is a fiduciary based on its discretion, authority, and/or control with respect to the administration, management, and/or disposition of the Plans and their assets, and its provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plans and Defendant's authority and responsibility with respect to the administration and management of the Plans and their retirement assets.

98.     Defendant controls the selection of the mutual funds available as investment options for the Plans and participants, provides investment advice for compensation with respect to these investment options, uses its custody, control, ownership and dominion over the Separate Accounts and accumulated units of assets of the Plans, and uses its discretionary authority and responsibility in the administration of the Plans to obtain revenue sharing payments from the mutual funds and to earn other compensation from self-dealing as described above.

99.     Defendant is prohibited from receiving benefits in connection with its position as a fiduciary of the Plans.

100.     The revenue sharing payments made by the mutual fund companies to Union Central constitute plan assets because: (a) Union Central received the payments as a result of its fiduciary status or function (*e.g.*, because Union Central received payments from mutual funds in exchange for offering and/or recommending the funds as an investment option to the Plans and

their participants); (b) the mutual funds make payments to Union Central at the expense of the Plans and participants (*e.g.*, because the mutual funds set the fees they charge Plans and participants to cover not only the fees they would normally charge, but also the amount of the revenue sharing payments they have to make to Union Central); and/or (c) revenue sharing payments effectively constitute the proceeds of the Plans' and participants' investments.

101.     Union Central is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), with respect to the revenue sharing payments, because it has discretion and control, or exercises authority, with respect to the management or disposition of these payments by arranging for, accepting, and retaining them, either directly or through its subsidiaries or affiliates.

102.     Union Central's arranging for and retention (or the retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, violates its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that Union Central failed and continues to fail to discharge its duties with respect to the Plans solely in the interest of the Plans' participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries and (ii) defraying reasonable expenses of administering the Plans with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

103.     Union Central breached its fiduciary duties by using its discretion and control over, or influence with respect to, the Separate Accounts, as well as their accumulation units, to generate the revenue sharing payments and other improper compensation for its own benefit. Union Central did not use the Separate Accounts and the accumulation units for the exclusive purpose of

providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and failed to act with the care, skill, prudence, and diligence of a prudent person.   As to the revenue sharing payments themselves, to the extent they constitute Plan assets, Union Central failed to use them for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and also failed to act with the care, skill, prudence, and diligence of a prudent person.

104.    As a direct result of Defendant's breaches of duties, Plaintiffs and the Class have suffered losses and damages.

105.    Pursuant to ERISA § 408, 29 U.S.C. § 1109, and ERISA § 502(a), Defendant is liable to restore to the Plans the losses they have suffered as a direct result of Defendant's breaches of fiduciary duty and is liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs, and other recoverable expenses of litigation.

## COUNT II

**(For Breach Of Fiduciary And Violation Of ERISA's Prohibited Transaction Rules)**

106.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

107.    Union Central has engaged in and continues to engage in prohibited transactions, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plans in its own interest or for its own account.

108.    Union Central's receipt and retention (or the receipt and/or retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, constituted and continues to

constitute prohibited transactions under ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in that the receipt of revenue sharing payments by Union Central amounts to and constitutes a fiduciary receiving consideration in the form of revenue sharing payments for its own personal account from parties such as mutual funds that are dealing with the Plans in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plans held in the separate accounts or sub-accounts, and/or represented by the accumulation units.   Specifically, the mutual funds deal with the Plans by accepting funds from Separate Accounts that represent the investment of the Plans' assets, and they do so in connection with transactions involving the assets of the Plans.   Furthermore, as explained above, Union Central also has engaged in prohibited transactions with respect to its control over the investments in the Separate Accounts and its earning of improper and excessive compensation through acts of self-dealing and by acting solely for its own benefit, as opposed to for the benefit of the Plans.

109.    Pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), Union Central is liable to the Plans to credit back, disgorge, and/or make restitution of all revenue sharing payments and other improper compensation received by it; or, alternatively, Union Central is liable to the Plans and the Class to pay damages or make restitution to the Plans in an amount representing the difference between the revenue sharing payments and other compensation that it received, and the reasonable fair market value of any services provided by Union Central.

110.    Plaintiffs and the Class also are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

111.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs and the Class seek an order declaring that the above-described practices of Union Central, in connection with the

revenue sharing payments and its earning of excessive compensation through self-dealing, violate ERISA, as set forth above, and seek a permanent injunction preventing Union Central from engaging in such conduct in the future.

**COUNT III**

**(For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)**

112.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

113.    In the alternative, to the extent that Defendant is not deemed a fiduciary or co-fiduciary under ERISA, Defendant is liable to the Class for all recoverable damages and relief as a non-fiduciary that knowingly participated in a breach of trust.

WHEREFORE, Butler National Corp. and C3 Capital, LLC, on behalf of themselves and the Class, demand judgment against Defendant, The Union Central Life Insurance Co., for the following relief:

(a)    Declaratory and injunctive relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), as detailed above;

(b)    Disgorgement, restitution, and/or damages as set forth above, plus any and all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2);

(c)    Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)    Attorneys' fees, costs, and other recoverable expenses of litigation; and

(e)    Such further and additional relief to which Plaintiffs and the Class may be justly

entitled and the Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the

undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served

upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt

requested.

Dated: March 1, 2012                         Respectfully submitted,


                                              /s/Jeffrey S. Goldenberg
                                             Jeffrey S. Goldenberg (0063771)
                                             Todd B. Naylor (0068388)
                                             Goldenberg Schneider LPA
                                             One West Fourth Street, 18th Floor
                                             Cincinnati, Ohio 45202
                                             Telephone:   (513) 345-8291
                                             Facsimile:   (513) 345-8294
                                             Email: jgoldenberg@gs-legal.com
                                                      tnaylor@gs-legal.com

                                             John M. Edgar (pro hac to be filed)
                                             John F. Edgar (pro hac to be filed)
                                             EDGAR LAW FIRM LLC
                                             1032 Pennsylvania Ave.
                                             Kansas City, MO   64105
                                             Telephone: (816) 531-0033
                                             Facsimile:   (816) 531-3322
                                             Email: jme@edgarlawfirm.com
                                                      jfe@edgardlawfirm.com

James E. Miller (pro hac to be filed)
Laurie Rubinow (pro hac to be filed)
Karen M. Leser (pro hac to be filed)
Shepherd Finkelman Miller
 & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
          lrubinow@sfmslaw.com
          kleser@sfmslaw.com

Ronald S. Kravitz (pro hac to be filed)
Liner Grode Stein Yankelevitz Sunshine
   Regenstreif & Taylor LLP
199 Fremont St., 20th Fl.
San Francisco, CA   94105
(415) 489-7700
(415) 489-7701 (facsimile)
Email: rkravitz@linerlaw.com

Attorneys for Plaintiffs
and the Proposed Class

## ENDORSEMENT FOR JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.


Respectfully submitted,

  /s/Jeffrey S. Goldenberg
Jeffrey S. Goldenberg (0063771)
Todd B. Naylor (0068388)
Goldenberg Schneider LPA
One West Fourth Street, 18th Floor
Cincinnati, Ohio 45202
Telephone:   (513) 345-8291
Facsimile:   (513) 345-8294
Email: jgoldenberg@gs-legal.com
          tnaylor@gs-legal.com